# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

DAVID BURGETT,                                        Civ. No. 09-2179 (ADM/AJB)

        Plaintiff,

v.                                                   **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

---

## INTRODUCTION

Plaintiff David Burgett disputes the unfavorable decision of the Commissioner of Social

Security, denying his application for disability insurance benefits ("DIB").  The matter is before

this Court, United States Magistrate Judge Arthur J. Boylan, for a report and recommendation to

the District Court on the parties' cross-motions for summary judgment.  See 28 U.S.C. §

636(b)(1) and Local Rule 72.1.  Plaintiff is represented by Lionel H. Peabody, Esq.  Defendant is

represented by Lonnie F. Bryan, Assistant United States Attorney.  This Court has jurisdiction

under 42 U.S.C. § 405(g).  Based on the reasoning set forth below, this Court recommends that

Plaintiff's motion for summary judgment [Docket No. 6] be granted, Defendant's motion for

summary judgment [Docket No. 10] be denied.

## PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on February 5, 2008,

alleging disability beginning May 25, 2006. (Tr. 114-18).[1] Plaintiff alleges disability from diabetes, glaucoma, PTSD, depression, hypertension, and tinnitus. (Tr. 151). His application was denied initially and upon reconsideration. (Tr. 67-80). Plaintiff timely requested a hearing before an administrative law judge, and the hearing was held on February 3, 2008, before Administrative Law Judge ("ALJ") Roger Thomas. (Tr. 85-88, 20-66). The ALJ issued an unfavorable decision on February 18, 2009. (Tr. 7-19). On June 22, 2009, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6). See 20 C.F.R. § 404.981. On August 20, 2009, Plaintiff sought review from this Court. The parties thereafter filed cross-motions for summary judgment.

## PLAINTIFF'S BACKGROUND AND MEDICAL HISTORY

Plaintiff was born on June 8, 1947, and was 58-years-old on the alleged disability onset date. (Tr. 114, 24). Plaintiff served in the army from 1966 to 1969, spending one year in Vietnam. (Tr. 321). He has a college education, and taught high school special education for thirty years. (Tr. 478, 648). Plaintiff retired from teaching in 2003, because he was disillusioned with the increased paperwork and disciplinary functions of his job. (Tr. 648). Plaintiff is receiving veteran's disability benefits.

Plaintiff's alleged onset date is May 25, 2006. Evidence before the onset date is relevant because, "[t]he ALJ should consider medical evidence in light of the medical presumptions that reasonably can be made about the course of the condition." Davis v. Astrue, No. C06-4106-

---

[1]     The Court will cite the Administrative Record in this matter, Docket No. 5, as "Tr."

PAZ, 2008 WL 130778, at *3 (N.D. Iowa Jan. 15, 2008).  Plaintiff went to Twin Ports VA Outpatient Clinic in January 2004, to establish care.  (Tr. 544).  Plaintiff then filed a claim for veteran's disability benefits on January 29, 2004, based on diabetes, depression secondary to diabetes, hearing loss, tinnitus, glaucoma, and PTSD.  (Tr. 691-96).  In support of his claim, Plaintiff wrote a narrative about his military experience.  (Tr. 694-95, 265-66).  Soon after arriving in Vietnam, Plaintiff was given guard duty at night near a jungle.  (Tr. 265).  He was not given any ammunition, so he acquired ammunition from an outside source but was discovered and chastised by an officer who took the ammunition.  (Id.)  This caused him not to trust his superiors.  (Id.)  He also distrusted his superiors because they chose to ignore intelligence about the Tet Offensive.  (Id.)

Plaintiff was near an Air Base at Nha Trang that was a target of the Viet Cong during the Tet Offensive.  (Id.)  Plaintiff's base was put on alert after a railroad was attacked.  (Id.) Plaintiff was assigned, with a loaded weapon, to the perimeter.  (Id.)  Enemy mortars were landing nearby, and the enemy infiltrated the perimeter of the ComCenter where Plaintiff was stationed.  (Id.)  There was a lot of gunfire, and it was difficult to know who to shoot.  (Id.)  It was the longest night of Plaintiff's life.  (Tr. 266).  The compound was enemy free by morning, but Plaintiff remained on guard duty.  (Id.)  Mortars were a constant threat during Plaintiff's tour of Vietnam, and usually fell at night.  (Id.)

Plaintiff's wife also wrote a letter in support of her husband's claim for veteran's disability benefits.  (Tr. 696, 268).  She stated that Plaintiff was a caring, loving, devoted father and husband, but he loses control of his temper for no reason.  (Tr. 268).  She noted that Plaintiff avoided crowds and needed to sit in a corner or on an aisle so he could see his way out.  (Id.)

After their three kids moved out, she stated Plaintiff was getting irritated with everything at the school where he worked.  (Id.)  She considered it her job to prevent Plaintiff from getting fired before he retired.  (Id.)  She said that now he was a "happy retiree" but was realizing some things were not right.  (Id.)  He used to be very busy, but now that he was retired and could sit and think, "thoughts are beginning to pour out."  (Id.)

On April 29, 2004, Plaintiff had his hearing tested.  (Tr. 540-41).  Audiologist Glenn Fronheiser opined that Plaintiff's hearing was normal bilaterally by VA standards.  (Tr. 541).  Plaintiff was also evaluated for diabetes that day.  (Tr. 668-70).  Plaintiff had a five year history of diabetes mellitus type 2, initially controlled by diet and exercise but now requiring two oral medications.  (Tr. 670).  There was no evidence of neuropathy.  (Id.)  He had symptoms of erectile dysfunction, obesity, and glaucoma.  (Id.)

Plaintiff also underwent a compensation and pension psychiatric exam with Dr. J.C. Whitacre, II through the Veteran's Administration "VA" on April 29, 2004.  (Tr. 673-675).  Plaintiff discussed his history and military experience.  (Tr. 674).  He also discussed his retirement and said he liked his job and was somewhat at a loss without it.  (Id.)  He was still coaching basketball in the winter, and was an assistant golf instructor in the summer.  (Id.)  Plaintiff reported that he was occasionally violent to objects but not to people.  (Id.)  He denied suicidality but was occasionally tearful.  (Id.)  Plaintiff stated that he was currently sleeping well, from 11:00 p.m. to 6:30 a.m., without nightmares, amnesias or sleep walking.  (Id.)  Plaintiff was sometimes irritable, helpless or frustrated by impotence but not suicidal.  (Id.)  Dr. Whitacre diagnosed adjustment reaction to diabetes with mild depression.  (Id.)  He assessed a GAF score

of 75.[2]  (Id.)

On June 4, 2004, Plaintiff was evaluated by Psychologist Ray Conroe for combat-related post traumatic stress disorder.  (Tr. 646-55).  Plaintiff was referred by his county service officer, who administered a checklist and thought the findings might reflect PTSD.  (Tr. 646).  In describing his history, Plaintiff reported that his father was a strict disciplinarian, but they became close and he was deeply saddened when his father died.  (Id.)  Plaintiff reported he was never close to his three younger siblings.  (Id.)

Plaintiff enlisted in the army in 1966.  (Tr. 647).  He served first in Europe but was sent to Vietnam in 1968.  (Tr. 648).  He was honorably discharged in 1969.  (Id.)  He worked in the Parks and Recreation Department for three years while attending college.  (Id.)  He got married while still in college, and immediately after graduating took a job teaching high school special education at Cloquet High School, where he taught for thirty years.  (Id.)  He enjoyed the job because he exercised almost total control with no outside interference.  (Id.)  He also coached football and basketball but experienced conflict dealing with others and was demoted from head coach to assistant coach.  (Tr. 649).  He was made to take an anger management class after wrestling an unruly bystander to the ground at a sporting event.  (Id.)

_____

[2]      "[T]he Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (quoting Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000) ("DSM-IV-TR")).  A GAF score of 31-40 indicates major impairment in several areas of functioning, a score of 41-50 indicates any serious impairment in social, occupational, or school functioning, a score of 51-60 indicates moderate difficulty in social, occupational, or school functioning, a score of 61-70 indicates mild symptoms or some difficulty in social, occupational or school functioning, and a score of 71-80 indicates no more than slight impairment in social, occupational or school functioning.  DSM-IV-TR at 32.

In 2003, Plaintiff retired from teaching.  (Id.)  He was disillusioned by the increased paperwork and the disciplinary functions he had to perform.  (Id.)  He continued on as an assistant girls basketball coach, which kept him busy much of the time.  (Id.)  In his retirement, he golfed, fished, served as quartermaster for the local VFW, did indoor and outdoor household projects, and played poker with former colleagues once a month.  (Id.)  He admitted that his wife did most of the parenting to their three children growing up because he was busy teaching and coaching.  (Id.)  After his retirement, one of their children continued to live with them part-time.  (Id.)  Plaintiff said his relationship with his wife was strained due to erectile dysfunction.  (Id.)  He admitted that he and his wife did little together and had never been on a vacation.  (Tr. 649-50).

Plaintiff had never received psychological services until January 2004.  (Tr. 650).  On the recommendation of a veteran's service officer, he began seeing a counselor at the Twin Ports VA Outpatient Clinic.  (Id.)  He also became involved in a PTSD support group.  (Id.)

In the clinical interview with Dr. Conroe, Plaintiff was affable but distant.  (Id.)  He was vague and disorganized in discussing symptoms of PTSD.  (Id.)  He displayed little humor or emotion and appeared mildly to moderately depressed.  (Id.)  He exhibited mild paranoid ideation.  (Id.)  His attention, concentration and memory were adequate.  (Tr. 651).  He rated himself a five or six on a depression scale of one to ten but had difficulty describing his symptoms.  (Id.)  He was frustrated and angry about his diabetes.  (Id.)  He did not sleep well, but his energy level was unaffected.  (Id.)  He said he never thought of harming others but occasionally had suicidal thoughts.  (Id.)  He also rated his anxiety level at a five or six on a scale of one to ten.  (Id.)  He denied autonomic hyperactivity, but said he had panic attacks in

crowds, although he could attend an event at the Metrodome with 12,000 spectators but not 60,000 spectators. (Id.) He was anxious about a planned trip to Las Vegas for fear of crowds. (Id.)

Plaintiff discussed his combat experiences during the Tet Offensive. (Tr. 651-52). He developed fear from being attacked and hearing mortars at night, and he developed mistrust in authority due to improper planning to defend against attack. (Tr. 652). He denied ongoing intrusive memories, nightmares and flashbacks, and said he never had intense psychological distress at exposure to internal or external cues. (Id.)

Plaintiff did not talk to his family about Vietnam but found it helpful to participate in a veteran's group. (Id.) He did not associate his fear of crowds to any trauma. (Id.) He did not experience markedly diminished interest in activities as a result of his experience. (Id.) He said he was close to only a few people before Vietnam, and even more so after. (Tr. 652-53). He had difficulty sleeping since returning from Vietnam, but said he was not thinking about his war experiences but about upcoming projects. (Tr. 653). He admitted to problems managing anger, and he became more irritable at school. (Id.) Dr. Conroe noted that neither Plaintiff nor his wife were able to directly associate his anger problems with his military experience. (Id.) Plaintiff said he did not become hypervigilant because of Vietnam, but he admitted to occasional exaggerated startle responses. (Id.) He said his symptoms over the past 25 years were exaggerated startle response, which had diminished, and managing anger. (Id.)

Dr. Conroe noted that Plaintiff scored 97 on the Mississippi Scale for Combat-related Post Traumatic Stress Disorder, where 107 was the cutoff score for Vietnam-era combat veterans diagnosed with PTSD. (Id.) Plaintiff was also given the MMPI-II personality test, and his

scores were valid.  (Id.)  The results indicated a profile consistent with an angry, sullen,

controlled person who externalizes blame and periodically displays anger outbursts.  (Id.)  Dr.

Conroe stated:

> [s]uch an individual is likely to be argumentative in personal
> contacts.  Interpersonal relationships are marked by guardedness
> and mistrust.  Health concerns are prominent.  Overall outlook is
> pessimistic, with a tendency to ruminate on self-perceived failures.
> Nevertheless, a relatively high level of energy is present.  The
> scale most closely associated with PTSD is elevated.

(Tr. 653).  Dr. Conroe diagnosed depressive disorder, NOS; specific phobia, situational type;

rule out intermittent explosive disorder; rule out personality disorder NOS, with passive-

aggressive, paranoid, and antisocial features; and a GAF score of 57.  (Tr. 654).  He found

Plaintiff difficult to diagnose.  (Id.)

Dr. Conroe opined that Plaintiff's clinical picture was of long-standing issues in

existence since childhood and more recent occupational, health and marital concerns.  (Id.)  He

noted that Plaintiff had experiences in Vietnam that could be considered trauma inducing, but he

opined that test results did not provide strong support for the PTSD diagnosis.  (Id.)

Plaintiff received a VA rating decision on August 24, 2004.  (Tr. 638-45).  He was

granted 30% disability for depression, 20% for diabetes mellitus type 2, 10% for tinnitus, the

rating for glaucoma was deferred, and claims for post traumatic stress disorder and hearing loss

were denied.  (Tr. 638-39).

Plaintiff had an annual physical exam with Dr. Ricard Puumala on July 19, 2005.  (Tr.

481.)  Plaintiff reported that he had not been doing his diabetic testing and just started dieting

and getting outdoor exercise.  (Id.)  Plaintiff was overweight, but his examination was otherwise

normal.  (Id.)

On July 29, 2005, Plaintiff's oldest daughter wrote a letter to the VA about her father (Tr. 586-88). She said he was very strict and his explosive temper was unpredictable. (Tr. 586). They were never close and she perceived he was always busy with his job and coaching. (Id.) She said Plaintiff never relaxed or rested, and it was like his brain never stopped. (Tr. 587). She gave numerous examples of his erratic behavior and inappropriate expressions of anger and criticism from her childhood. (Id.) She indicated that he had little patience and hated crowds. (Id.) He never talked about Vietnam with her. (Tr. 588).

Plaintiff saw Dr. John Chatel at Twin Ports Clinic on August 3, 2005. (Tr. 459). Plaintiff reported that he continued to have flashbacks and nightmares of things he experienced in Vietnam. (Id.) Plaintiff also reported that he liked to sit with his back to the wall in restaurants to plan his escape route, he had an exaggerated startle response, he slept poorly, and it was difficult for him to be loving with others. (Id.) Plaintiff's wife wrote a letter to Dr. Chatel stating that Plaintiff had anger control issues since she met him more than 30 years ago. (Id.) She said that they had holes in their home that Plaintiff made when he was angry. (Id.) She also reported that Plaintiff lost a coaching job, had fits of swearing, and threw objects. (Id.) She described an incident from a week earlier where Plaintiff had thrown something in a store in anger. (Id.) She also noted she and her daughters feared Plaintiff's reactions to things and tried to keep things from him. (Tr. 460). She reported that Plaintiff had glaucoma and diabetes, but he was not monitoring his diabetes over the last year. (Tr. 459).

Plaintiff's wife indicated that he did not sleep well, having dreams or nightmares almost every night. (Tr. 460). She also reported that Plaintiff had a great fear of the unknown and he wouldn't go anywhere without extensive planning. (Id.) She noted that Plaintiff drank a lot

when he first got out of the military but had his last drink of alcohol seven or eight years ago. (Tr. 460-61).

On mental status examination, Plaintiff was friendly, cooperative, punctual, appropriately dressed and groomed, and his speech was relevant, coherent and goal-oriented. (Tr. 461). He had thoughts of self harm because he was no longer needed after he retired, and he had thought of how to carry out his suicide. (Id.) Plaintiff also admitted to visual hallucinations, particularly at night, of flashbacks of people and of guns going off. (Id.) Plaintiff indicated this happened four or five times a week. (Id.) Plaintiff's mood was depressed. (Id.) Dr. Chatel diagnosed post traumatic stress disorder, major depressive disorder, recurrent and severe and mood congruent with psychotic features, and he assessed a GAF score of 50. (Id.)

On August 12, 2005, Plaintiff's mental status examination was unchanged since his previous visit. (Tr. 458). On August 22, 2005, he reported an improvement of his anxiety level on a low dose of Fluoxetine, noticing that he remained mellow during an incident that would have caused anger in the past. (Tr. 457-58). On September 14, 2005, Plaintiff's mental status examination was essentially unchanged since the last visit. (Tr. 456). On September 28, 2005, Dr. Chatel noted Plaintiff to be markedly changed since August 3, 2005, in that he had less frequent thoughts of self harm, but his mistrust of authority and anger issues continued. (Tr. 455).

On October 4, 2005, Mike Haburt wrote a letter to the VA in support of Plaintiff's claim for disability. (Tr. 559). Mr. Haburt indicated that he had known Plaintiff for two years, and Plaintiff's symptoms of PTSD had escalated. (Id.) He said Plaintiff was once easy going and friendly but had become resentful, fearful and very paranoid. (Id.) He noted that Plaintiff's

angry outbursts were a problem in his personal life. (Id.) Mr. Haburt indicated that Plaintiff said sleep was still a problem for him, he slept only a few hours before his dreams woke him up. (Id.) He stated that Plaintiff had called him and talked long into the night to calm down. (Id.) He also said he was concerned for Plaintiff's safety because he recently bought a gun, and he often talked about being worth more dead than alive. (Id.)

On October 6, 2005, Plaintiff underwent a psychological examination with Dr. Gary Fischler. (Tr. 518-23). Plaintiff reported that he socialized occasionally, enjoyed golfing and fishing alone, and was not close to others. (Tr. 518). Plaintiff was on Prozac, and rated the effectiveness as "fair." (Tr. 519). Plaintiff reported that his depression had gotten worse, as did his relationship with his wife, and he was increasingly suicidal. (Id.) Plaintiff thought he might have symptoms of PTSD. (Id.)

On mental status exam, Dr. Fischler noted Plaintiff's psychomotor activity to be slow, his affect flat, and his mood depressed. (Tr. 519-20). Plaintiff said his concentration was "ok" and his energy level average. (Tr. 520). Dr. Fischler assessed Plaintiff's intelligence as above average, and noted that Plaintiff held beliefs that the government was "anti-veteran" and the school administration was out to make his job difficult. (Tr. 520-21). Plaintiff reported that he had trouble with sleep, usually sleeping four or five hours but feeling rested. (Tr. 521). Plaintiff also reported that he had inappropriate behavior, including throwing things and yelling at people in cars or on the golf course. (Id.) He stated that he checked his doors and windows six times a day. (Id.) He was anxious in crowds, and avoided church on big holidays. (Id.) Plaintiff last had suicidal ideation ten days earlier. (Id.) He stated that he bought a gun for protection, and did not have strong feelings about shooting himself, he would rather use CO poisoning. (Id.)

Dr. Fischler diagnosed major depressive disorder, recurrent, and a GAF score of 65. (Id.) He opined that Plaintiff was "somewhat socially withdrawn, with inappropriate anger at times." (Tr. 523). He noted that although Plaintiff complained of increased depression over one and a half years, there was no objective change. (Id.)

Plaintiff also had an opthamology consult on October 6, 2005. (Tr. 780-82). Plaintiff had the following conditions: glaucoma, diabetes with background diabetic retinopathy, mild cataracts (not visually significant), myopia, astigmatism and presbyopia (Tr. 781).

On November 3, 2005, Plaintiff's veteran's disability rating for depression was increased to 50% effective August 3, 2005. (Tr. 555-58). The decision was based on Plaintiff's treatment and evaluation at Twin Ports Outpatient Clinic on August 3, 2005. (Tr. 556). The rating decision raised Plaintiff's combined compensation to 70% when his diabetes, tinnitus, and glaucoma were included. (Tr. 557). Plaintiff's conditions of bilateral hearing loss and PTSD were found not to be service connected, but the VA noted it would reconsider when it received treatment records from the Duluth Vet Center. (Tr. 556, 558).

Plaintiff saw Clinical Nurse Specialist Jeannette Merrill at Twin Ports Clinic on November 3, 2005. (Tr. 445). Nurse Merrill noted that Plaintiff's care was transferred to her from Dr. Chatel. (Tr. 446). Plaintiff reported that he was on 10mg of Prozac, a low dose because it was causing libido problems. (Id.) Nurse Merrill noted that Plaintiff looked depressed but denied suicidal or homicidal ideation. (Id.) Plaintiff reported that he went to bed at 11:00 p.m. but spent much of the night up and down. (Id.)

Plaintiff told stories about being placed on guard duty without ammunition, and he once had to hitchhike forty miles from the jungle to get back to base. (Id.) Plaintiff also talked about

being present during the Tet Offensive.  (Tr. 447).  Plaintiff reported avoiding fireworks and war movies after he got back.  (Id.)

Plaintiff told Nurse Merrill he had been retired for three years from his career as a special education teacher, and the only reason he had been able to do the job was because he was left alone with the students.  (Id.)  On mental status examination, Plaintiff was very restless with a flat affect and depressed mood, but otherwise normal.  (Id.)  Nurse Merrill encouraged Plaintiff to continue to attend groups at the Vet's Center.  (Id.)  Plaintiff did not want to increase his Prozac, but he was interested in trying Trazadone to help with sleep.  (Id.)

On December 6, 2005, Plaintiff saw Nurse Merrill for medication management.  (Tr. 444).  Plaintiff denied any medication side effects and stated Trazadone was helping him sleep. (Id.)  Plaintiff denied suicidal or homicidal ideation, and his mood was euthymic.  (Id.)  He reported having war-related nightmares a couple of times a week.  (Id.)  He also reported that when they had a lot of people over at his house, he had to stay busy or go off by himself.  (Id.) Plaintiff reported he did not like large crowds, but he could tolerate it for a short amount of time. (Tr. 445).  Nurse Merrill questioned whether the Prozac was working.  (Tr. 444).  On December 9, 2005, Nurse Merrill wrote a letter to the VA in support of Plaintiff's claim for disability from depression and PTSD, stating she did not believe he could work at any gainful employment.  (Tr. 453).

On December 12, 2005, Counselor Robert Evanson of the Duluth Vet Center wrote a letter supporting Plaintiff's request for an increase of disability compensation from the VA.  (Tr. 472).  He noted that he had been seeing Plaintiff weekly since February 10, 2004.  (Id.)  He stated that Plaintiff's PTSD, depression, anxiety and sleep problems were a constant frustration

for him, and he continued to emotionally distance himself from family. (<u>Id.</u>)

Vietnam Veteran Jim Frey wrote an undated letter to the VA in support of Plaintiff's request for an increase of disability compensation. (Tr. 508-09) Mr. Frey indicated that he was in a "Vet Group" with Plaintiff for over two years but had known him for thirty years. (Tr. 508). He stated that he saw Plaintiff's condition deteriorate in the last year. (<u>Id.</u>) He further stated that nothing had come to the surface for Plaintiff until the last two years, when he was forced to retire because of his anger problem and quick temper. (<u>Id.</u>) He described Plaintiff as outwardly calm but a "raging maniac" on the inside. (<u>Id.</u>)

Plaintiff was seen by Counselor Robert Evanson and Phil Ringstrom at the Duluth Veteran's Center on December 13, 2005. (<u>Id.</u>) Plaintiff complained of sleep problems and anger outbursts. (Tr. 466). He stated that he had to keep busy, and he had three volunteer jobs. (<u>Id.</u>) Plaintiff's mental status examination was normal with the exception of flat affect. (<u>Id.</u>) Plaintiff was noted to show signs of contentiousness, hypervigilance, and control. (<u>Id.</u>) Plaintiff reported past suicidal thoughts but no homicidal thoughts. (<u>Id.</u>)

Plaintiff described his history. Plaintiff joined the army in 1966, at age 19. (<u>Id.</u>) After the war, Plaintiff indicated that he had trouble with authority and his anger caused him to lose jobs. (<u>Id.</u>) He got his degree and became a teacher. (<u>Id.</u>) He married and had three children. (<u>Id.</u>) Plaintiff stated that he continued to distrust authority, avoided getting close to others, was defensive, and had extreme anger outbursts. (<u>Id.</u>)

Plaintiff was next evaluated by Nurse Practitioner Bonnie Larson for an increase in his disability rating for diabetes on December 15, 2006. (Tr. 788-89). She noted that Plaintiff had recently been started on insulin once a day in addition to two oral medications. (Tr. 788).

Plaintiff denied diabetic retinopathy or peripheral neuropathy, but he did have glaucoma.  (Id.)
Plaintiff's examination was normal and his hypertension adequately controlled.  (Tr. 788-89).

In January 2006, Plaintiff saw Dr. Puumala pre-operatively for debridement of his right
knee.  (Tr. 774).  Plaintiff's knee was being treated for known arthritis.  (Id.)  Dr. Puumala noted
Plaintiff had his left knee debrided in 2000.  (Id.)

Plaintiff saw Nurse Merrill for medication management on March 6, 2006.  (Tr. 382).
She noted that Plaintiff denied any side effects to his medication.  (Tr. 383).  Plaintiff was taking
Prozac every other day, and only a half tablet of Trazadone.  (Id.)  Plaintiff admitted to
nightmares "but mainly he has had dreams."  (Id.)  Plaintiff reported that he wanted to be by
himself, especially in the wintertime.  (Id.)  He was, however, continuing to coach a basketball
team.  (Id.)  His mental status examination was normal other than a flat affect and dysthymic
mood.  (Id.)  Nurse Merrill encouraged Plaintiff to take Prozac every day.  (Id.)

On March 28, 2006, the VA issued a decision on Plaintiff's claim for service connected
compensation, continuing Plaintiff's rating for depression at 50% and denying Plaintiff's claim
for post traumatic stress disorder.  (Tr. 433).  It was noted that Dr. Chatel diagnosed PTSD, but
he did not indicate the necessary criteria for a clinical diagnosis.  (Tr. 435).  It was also noted
that Plaintiff had statements about his PTSD from others, but they were not qualified medical
examiners.  (Id.)

On June 19, 2006, Plaintiff saw Nurse Merrill for medication management and follow-up.
(Tr. 357-59).  She noted that Plaintiff was only taking 10mg of Prozac every other day, and he
looked more depressed.  (Tr. 358).  He denied feeling depressed, but Nurse Merrill stated, "I am
sure he is numbing some of his feelings."  (Id.)  Nurse Merrill noted Plaintiff was still coaching,

and he was turned down for service connection for PTSD.  (Id.)

Plaintiff reported that he went to bed about midnight, but he did not sleep well due to nightmares three or four times a week.  (Id.)  Plaintiff described his appetite as good, and his energy level as fair.  (Id.)  He said he was doing a little golfing.  (Id.)  Plaintiff also said he was coaching at Cloquet High School.  (Id.)  Plaintiff reported having surgery on both eyes for glaucoma, and surgery for sinusitis.  (Id.)  He also said he went to Arizona with his wife for ten days.  (Id.)  Nurse Merrill noted Plaintiff did not seem to be as excited as she would expect that he was inducted into the Minnesota Basketball Coaches Hall of Fame.  (Id.)  She further noted that although he was not a very sociable person, Plaintiff enjoyed coaching, and coached for summer programs.  (Id.)

On mental status examination, Plaintiff was calm, with normal speech, flat affect and depressed mood.  (Id.)  His thoughts were organized and goal directed.  (Id.)  He denied suicidal or homicidal ideation.  (Id.)  Nurse Merrill again described Plaintiff's condition as stable.  (Tr. 359).  She encouraged Plaintiff to increase his Prozac to at least once a day.  (Id.)

About a week later, Plaintiff saw Psychiatrist Larry Broome.  (Tr. 846).  Plaintiff reported having two or three nightmares a week with autonomic hyperactivity.  (Id.)  Dr. Broome noted that Plaintiff's state of apprehensiveness with anger control issues continued.  (Id.)  He also noted that Plaintiff's sleep and energy level were presently adequate, but he continued to suffer depression characterized by sadness, quasi-hopelessness, and recurrent suicidal ideation without a plan.  (Id.)  On mental status examination, Dr. Broome noted that Plaintiff's mood was mildly depressed with attendant anxiety, and his affect was moderately constricted.  (Id.)  Dr. Broome noted that Plaintiff's dosage of Prozac was very low and probably suboptimal.  (Id.)  He

recommended an increase to 20mg, but maintained the current dose. (Id.)

Plaintiff had a follow-up physical exam on August 16, 2006. (Tr. 351). Physician Assistant Kristofer Wallman noted Plaintiff had right knee arthroscopy the last year, but did not have any complaints at present. (Id.) Plaintiff's diabetes was poorly controlled. (Tr. 353).

Plaintiff had an annual physical exam with Dr. Puumala a few months later. (Tr. 328). Plaintiff's blood sugars were high and he admitted not following his diet. (Id.) He recently had surgery for sinusitis, but otherwise felt good. (Id.) Examination was generally normal. (Id.)

Plaintiff underwent a compensation and pension examination by Psychologist Philip Sarff at the VA Medical Center on November 1, 2006. (Tr. 345-51). Dr. Sarff noted that Plaintiff was being treated with Fluoxetine and Trazadone, which Plaintiff believed might be causing irritability. (Tr. 346). Plaintiff indicated Trazadone was helping with sleep onset, but he wasn't sure Prozac was doing anything. (Id.) He described his marriage as shaky due to irritability and other factors. (Id.) Plaintiff reported that he spent most of his time sitting in the garage, and he treated his garage and his yard as his "fort." (Tr. 346-47).

On psychiatric examination, Plaintiff was noted to have a "slow personal tempo," his speech was hesitant, clear and coherent, he was cooperative, and his affect was flat and mood depressed. (Tr. 347). Plaintiff reported feeling "really down" and delaying initiation of insulin for three weeks. (Id.) Plaintiff said his concentration was poor, but he could slowly count serial 7s and spell a word forward and backward. (Id.) He was fully oriented, and his thought process unremarkable. (Id.) He described feelings of being worthless, and distrusting authority. (Tr. 347-48). Plaintiff reported having a sleep problem, with an average of five hours sleep, but after which he felt rested. (Tr. 348). He reported having nightmares about a soldier blowing up in

front of him. (Id.) Plaintiff also said he checked the doors, the garage, and his yard whenever he got up in the middle of the night. (Id.) He said he was obsessive about planning projects before he did them. (Id.) Plaintiff also reported that he had thought about killing people in the past, such as administrators or related to incidents on the road. (Id.) He also reported having suicidal ideation three or four times a week, with two plans that he never acted on. (Tr. 348-49).

Plaintiff also reported an episode of his inappropriate behavior at a store in April 2006. (Tr. 348). He stated that he got angry and threw a battery against the wall when it was not on sale and "the clerk gave him some attitude." (Id.)

Plaintiff indicated that he had slight problems with doing household chores, and that he liked to avoid crowds when shopping. (Tr. 349). He also reported that he liked to fish and golf, but had lost interest in fishing. (Id.)

Plaintiff was asked about the discrepancy between information about his PTSD symptoms that he gave during a 2004 evaluation and the current treatment records. (Tr. 349). Plaintiff stated that he underreported symptoms in 2004 due to shame from admitting he had problems. (Id.) Dr. Sarff noted Plaintiff reported intrusive memories, nightmares, avoidance of things like fireworks, hypervigilance, irritability, insomnia, and concentration problems. (Id.) Plaintiff's remote memory was normal and recent and immediate memory were mildly impaired. (Id.) Dr. Sarff diagnosed major depressive disorder, recurrent; anxiety disorder, NOS; and paranoid and obsessive personality traits, with a GAF score of 60. (Tr. 350).

Plaintiff next saw Nurse Merrill on November 7, 2006. (Tr. 343-45). She noted the psychiatrist whom Plaintiff saw annually recommended increasing Plaintiff's Prozac, but Plaintiff was not willing to do so. (Tr. 343-44). Plaintiff reported isolating continually and

having anger control issues. (Tr. 344). Nurse Merrill noted Plaintiff's mood was dysthymic and he denied suicidal or homicidal ideation. (Id.) Plaintiff stated that he had a good relationship with his wife and had just been on a trip to Arkansas. (Id.) He also said that he enjoyed golfing. (Id.) His mental status examination was normal with the exception of his mood being "more dysthymic than depressed." (Id.) Nurse Merrill indicated that Plaintiff's condition was "stable, not showing significant change, but with chronic symptoms and/or dysfunction." (Id.)

On December 12, 2006, Robert Evanson, a counselor at the Duluth Veteran's Center, wrote a letter to the Department of Veteran's Affairs in support of Plaintiff's request for increase of disability rating for post traumatic stress disorder. (Tr. 264). Mr. Evanson stated that he saw Plaintiff weekly beginning February 10, 2004. (Id.) He further stated:

> Mr. Burgett's PTSD, depression, anxiety, and sleep problems are a constant frustration to him. Emotional distancing from family and other significant relationships continues. He struggles constantly with efforts to please himself.

(Id.)

On December 15, 2006, Nurse Practitioner Bonnie Larson noted Plaintiff had been diagnosed with diabetes mellitus eight or nine years ago. (Tr. 321-22). Most of that time, his diabetes was not under good control, but recently became controlled with insulin, diet and exercise. (Tr. 321). Plaintiff denied retinopathy and peripheral neuropathy. (Tr. 322). Ms. Larson noted there were no restrictions of activities. (Id.)

Plaintiff's wife wrote an undated letter to the VA about Plaintiff's behavior in support of his VA disability claim. (Tr. 324-25). She stated that after receiving materials about PTSD, she had no doubt her husband had PTSD their entire lives together. (Tr. 324). She stated that things had gotten much worse since Plaintiff retired. (Id.) She said their three daughters lived with it

19

their entire lives, living on pins and needles in fear of their father's temper or embarrassing them. (Id.)  Plaintiff's wife also related being afraid after her husband bought guns, which he told her were investments.  (Id.)  She noted that Plaintiff sleeps now because he is on medication, but he still has nightmares and night sweats.  (Id.)  She stated that until recently, he would not initiate any phone calls, even to family.  (Id.)

Plaintiff stated that her husband appeared to be a happy, jovial guy, but this was deceptive.  (Tr. 325).  She said he had improved because one of his daughters would now call him to see how he was doing, which never would have happened before.  (Id.)  She stated that every day was a strain on their marriage.  (Id.)

On January 4, 2007, Dr. Ricard Puumala wrote a "To Whom It May Concern" letter about Plaintiff.  (Tr. 331).  He stated that he treated Plaintiff for two decades.  (Id.)  He further stated in pertinent part:

> Over a period of time he has had some problems with anger management, including an episode of on ice fisticuffs at a Bantam hockey game, and losing a high school coaching job for excessive anger with his players.  He had some overuse of ethanol, but this was self-limited.
> . . .
>
> I believe that PTSD should be included in his list of disabilities, and appropriate compensation be awarded.

(Tr. 331).

Plaintiff attended a meeting with Tom Hanson of the VFW and DRO Sarah Johnson on February 1, 2007, to discuss a VA disability rating of PTSD and depression.  (Tr. 330).  Plaintiff said he retired from a job he enjoyed, teaching kids in special education.  (Id.)  He related that he did not get along with the administration.  (Id.)  He also said he was removed from his coaching

duties.  (Id.)  Plaintiff said he had anger and authority issues, and he mistrusted everyone.  (Id.)

He described "raging" in the past.  (Id.)  He said before he was medicated, it was normal for him

to get only three hours of sleep, and to get up to check windows, doors, the garage, and that traps

were set.  (Id.)  Plaintiff described exposure to mortar fire regularly in Vietnam.  (Id.)

On February 15, 2007, Plaintiff was granted a 100% rating from the Veteran's

Administration as of August 3, 2005.  (Tr. 280-91).  His rating for post traumatic stress disorder

and depression was increased to 70%, with an additional 10% for tinnitus, 20% for diabetes

mellitus type 2, and 10% for glaucoma.  (Tr. 290).  Because the VA does not add the individual

percentages, his overall combined rating was 80%, but increased to 100% based on

unemployability.  ( Tr. 285-86.)

Plaintiff's disability rating for depression and PTSD was raised from 50% to 70% for the

following reasons:

> A review of your Twin Ports records shows that you have been
> treated there for PTSD.  There are examinations in your record
> which are thorough and contain 5 Axis diagnoses with PTSD due
> to combat experiences being the primary diagnosis. . .
>
> Because you have been diagnosed with PTSD and it has been
> linked to your Vietnam experience, service connection for PTSD is
> granted.
> . . .
> Depression and PTSD is evaluated together as they are
> inextricably intertwined.  An evaluation of 70% is assigned from
> August 3, 2005.  An evaluation of 70 percent is assigned for
> occupational and social impairment, with deficiencies in most
> areas, such as work, school, family relations, judgment, thinking,
> or mood, due to such symptoms as: suicidal ideation; obsessional
> rituals which interfere with routine activities; speech intermittently
> illogical, obscure or irrelevant; near continuous panic or
> depression affecting the ability to function independently,
> appropriately and effectively; impaired impulse control (such as
> unprovoked irritability with periods of violence); spatial

disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); inability to establish and maintain effective relationships.

A review of your treatment record shows that you have the symptoms contemplated by this level of evaluation. You have been suicidal and homicidal. Anger management is a problem. You have been violent to objects, throwing things when angry. You once got in a fight at a bantam hockey game. Evidence submitted by others notes you lost your coaching job because of anger towards your students. Your family relationships are nonexistent or shaky. You exhibit ritualistic behavior in the checking of your home perimeters. You lose your temper easily and avoid crowds. Your anger and authority problems have affected major relationships negatively.

(Tr. 286).

Plaintiff saw Nurse Merrill for follow-up on March 7, 2007. (Tr. 824-27). Plaintiff denied side effects from Prozac and Trazadone. (Tr. 826). Plaintiff's mood was euthymic, and he reported he was sleeping fairly well but still had some recurring nightmares about once a week with night sweats. (Id.) His energy level was good, and he was looking forward to spending a few weeks in Arizona with his wife. (Id.) Plaintiff's mental status examination was normal. (Id.) Nurse Merrill rated Plaintiff's condition as stable but with chronic symptoms. (Tr. 827).

Plaintiff had a physical examination with Dr. Puumala on October 25, 2007. (Tr. 772). Dr. Puumala noted that nothing really was new. (Id.) Plaintiff's blood pressure was getting too high, and he had some pitting edema in his ankles, so Dr. Puumala increased his Hydrochlorothiazide and Lisinopril. (Id.) Two months later, Plaintiff had no complaints at his annual physical examination with Physician Assistant Kristofer Wallman at the VAMC on December 21, 2007. (Tr. 815-16).

Plaintiff saw Nurse Merrill again on August 9, 2007. (Tr. 820-23). Plaintiff reported that he was keeping himself busy, although he frequently had thoughts about his military experience. (Tr. 821). He reported golfing with his wife, and being active in the VFW. (Id.) He had a stretch of difficulty sleeping, even with the Trazadone. (Id.) He still had nightmares but not often. (Id.) He kept himself busy to avoid thoughts about his military experiences. (Tr. 822). Plaintiff's mental status examination was normal with the exception of flat affect and dysthymic mood. (Id.) Nurse Merrill rated Plaintiff's condition as stable without significant change, but with chronic symptoms. (Id.)

On November 7, 2007, Plaintiff told Nurse Merrill his mood had been good. (Tr. 818). Plaintiff denied medication side effects and suicidal or homicidal ideation. (Id.) He reported sleeping through the night. (Id.) Plaintiff said he was active with the honor guard and the VFW. (Id.) He also reported coaching sports and golfing in the summer. (Id.) He stated that he had an excellent relationship with his wife and children. (Id.) Plaintiff's mental status exam was normal, and his mood euthymic. (Tr. 819). Nurse Merrill rated Plaintiff as "stable, without serious functional impairment." (Id.)

About six months later, Plaintiff underwent a consultative psychological evaluation with Dr. Marcus Desmonde on April 10, 2008. (Tr. 1030-32). Dr. Desmonde noted Plaintiff last worked as a high school basketball coach, but that ended the prior month. (Tr. 1030). Plaintiff reported that his prescription medications caused sedation, frequent urination, and dry mouth. (Id.) Plaintiff stated that when he got back from Vietnam he was an angry mess, and he didn't know how his wife put up with him for 37 years. (Id.) Plaintiff reported seeing horrible things in Vietnam and still having nightmares three or four times a week. (Id.)

Plaintiff said he tried to exercise every day, and golf in the summer. (Tr. 1031). He also reported enjoying fishing. (Id.) Plaintiff stated he could not do many chores around the house because he did not have the energy or stamina, and he had a short temper and anger issues. (Id.) He reported that he had to get out of coaching due to his temper. (Id.) He also reported that he woke up two or three times a night to checks locks and the perimeter of his house. (Id.)

Dr. Desmonde noted that Plaintiff was tense and anxious upon examination. (Id.) He exhibited a mild hand tremor and poor eye contact. (Id.) Plaintiff reported having variable energy levels, irritability, and fatigue. (Id.) He reported depression, and varying degrees of concentration and memory. (Id.) He stated that on bad days, his wife knew to leave him alone. (Id.) Plaintiff reported having night terrors and nightmares, and becoming nervous when helicopters fly overhead. (Id.) Plaintiff's mental status examination, including memory and concentration, was normal. (Tr. 1032). Plaintiff also reported physical impairments of diabetes with peripheral neuropathy and vision problems. (Id.) Dr. Desmonde diagnosed post traumatic stress disorder, and major depressive disorder, with a GAF score of 55-65. (Id.) He opined that Plaintiff would be capable of understanding simple to complex instructions, with the ability to carry out tasks within any limitations set by a physician, but he may have significant problems interacting with co-workers, supervisors, and the general public and would not be able to tolerate the stress and pressure of competitive employment "at this time." (Id.)

Plaintiff saw Nurse Merrill for follow-up on May 6, 2008. (Tr. 1054-57 ). Plaintiff appeared more depressed, and reported that he had been denied for social security disability. (Tr. 1055-56). He reported not sleeping well, tossing and turning and having night sweats. (Tr. 1056). Plaintiff reported Trazadone was helping but not as much as before. (Id.) He also

reported that he resigned from coaching because it was getting to be too much for him. (Id.) He indicated, however, that he had gone to Arizona for ten days to see a friend and golf, and enjoyed himself. (Id.) Nurse Merrill noted Plaintiff looked much more depressed but was not willing to increase his medication. (Id.) Plaintiff felt the long winter had been difficult for him. (Id.) Plaintiff's mental status examination was normal apart from his appearance of depression. (Id.) Nurse Merrill rated Plaintiff's condition as stable but with chronic symptoms. (Tr. 1057).

Plaintiff saw Dr. Salma Jamal for evaluation of his vision problems on May 8, 2008. (Tr. 1202-05). Dr. Jamal noted Plaintiff had moderate visual field defects that would interfere with his ability to climb up and down ladders and on curbs. (Id.) She noted Plaintiff's distance vision was adequate, and that he could read ordinary size print. (Id.) She also noted Plaintiff showed early to moderate signs of diabetic retinopathy, which could progress if he did not control his blood sugars. (Id.)

On May 23, 2008, Dr. Chang Wuk Kang completed a Psychiatric Review Technique Form regarding Plaintiff's mental impairments. (Tr. 1211-24). Dr. Kang found Plaintiff to meet the "paragraph A criteria" for depression and PTSD, but the impairments were not severe. (Tr. 1211, 1214, 1216). Thus, under the "B criteria," Dr. Kang found that Plaintiff had no limitations in daily activities, social functioning, maintaining concentration, persistence or pace, and had no episodes of decompensation. (Tr. 1221). Dr. Kang opined that Plaintiff appeared to be in remission because on August 9 and November 7, 2007, Plaintiff was symptom free upon mental health examination. (Tr. 1209). Dr. Kang also found that Plaintiff had only minimal symptoms when he was evaluated by Dr. Desmond in May 2008. (Id.) Dr. Russell Ludeke affirmed Dr. Kang's opinion on October 14, 2008. (Tr. 1251-53).

On May 24, 2008, Dr. Charles Grant completed a Physical Residual Functional Capacity Form regarding Plaintiff's physical impairments at the request of the Social Security Administration. (Tr. 1229-36). Dr. Grant opined that Plaintiff had no exertional limitations, could never climb ramps, stairs, ropes, ladders or scaffolds, had limited depth perception and field of vision, but no other limitations. (Tr. 1230-35). Dr. Sandra Eames affirmed Dr. Grant's opinion on October 14, 2008. (Tr. 1254-56).

Plaintiff saw Nurse Merrill for follow-up on November 4, 2008. (Tr. 1274-76). Nurse Merrill noted Plaintiff bought a motor home in Arizona, and was considering moving there. (Tr. 1275). She also noted Plaintiff planned to go on a cruise to Alaska in the summer. (Id.) Plaintiff denied medication side effects, and said his mood was up and down. (Id.) He reported more anxiety, which Nurse Merrill opined was due to the things going on in his life. (Id.) Plaintiff said he was having a lot of dreams that woke him up but no nightmares. (Id.) He reported that his energy level was o.k. (Id.) Plaintiff's mental status examination was normal and his mood was euthymic. (Tr. 1276). Nurse Merrill encouraged Plaintiff to take Prozac every day because she thought it would help with his anxiety. (Id.)

**TESTIMONY AT THE ADMINISTRATIVE HEARING**

Plaintiff testified to the following at the hearing before the ALJ. Plaintiff was rated at 80% disability plus 20% unemployability from the VA as of 2005. (Tr. 27). Plaintiff has a Master's equivalency degree. (Tr. 28). Since May 2006, he has had some part-time jobs. He coached girls' basketball in 2007 and 2008, until he decided to quit. (Tr. 28, 30). He was last paid as the quartermaster for the local VFW approximately eighteen months ago, although he still held the title in name only. (Tr. 29-30.) He also worked at a golf course, operating the cash

register in the pro shop, at most, ten hours a week in the summer of 2006.  (Tr. 30-31).

Plaintiff takes medication for psychiatric impairments and believes the medication is helpful.  (Tr. 34).  Plaintiff had rage reactions, but he is under better control.  (Tr. 35).  Plaintiff explained that when he taught special education, he could handle the job because he "had his own little kingdom."  (Tr. 35).  Noone ever bothered him.  (Tr. 36).  He retired when the paperwork in special education got to be overwhelming, and he didn't want to learn a new computer program.  (Tr. 37, 38).

Plaintiff had surgery on both of his knees, but he can walk a mile.  (Tr. 39).  He can stand for about 45 minutes, but standing long periods makes his knees hurt.  (Tr. 41).  He does not believe he can be on his feet more than three hours in a day.  (Id.)

Plaintiff described his symptoms of PTSD.  (Tr. 42),  He had trouble sleeping, and when up at night, he checked the locks, the garage, and the yard to make sure everything was safe.  (Id.)  Plaintiff also had a severe distrust of authority figures.  (Id.)  He avoided conflict with the school administration when teaching by just spending all of his time with the kids.  (Tr. 43-44.)  Plaintiff does not believe he could have continued teaching special education because the paperwork and the bureaucracy of being a teacher became too much for him.  (Tr. 45).

Plaintiff reacts to stress by overeating and becoming very defensive.  (Id.)  He has problems with anger.  (Id.)  Most recently, he got in a heated argument in a restaurant when someone wanted to change the television station.  (Tr. 46).  He knew he was wrong but couldn't stop himself.  (Id.)  Things like that had happened many other times.  (Tr. 47).  When he is angry or his knees hurt, he has difficulty staying on task.  (Tr. 48).

In the winter, Plaintiff spends his days watching television, reading, and making

birdhouses in his garage, which is a two-hour job. (Tr. 48). Because of his emotional problems, he stopped watching the news of the wars in Iraq and Afghanistan. (Id.) About once a week, Plaintiff has a bad emotional day and does not do anything. (Tr. 49). He was able to work every day before he retired because he had to provide for his family. (Tr. 49).

Plaintiff has thoughts of self harm every couple of weeks. (Tr. 50). Going to the Vet Center had been helpful to him, but he did not believe he could work full-time. (Id.)

Plaintiff's wife testified that Plaintiff's activities such as coaching and being a quartermaster helped him by giving him something to do because his mind was going a million miles an hour. (Tr. 52). She said he needed reminders to take insulin and use his eye drops. (Tr. 53).

Plaintiff's wife testified that before Plaintiff retired his temper was getting worse and she was afraid he was going to hit a student. (Tr. 54). She did not believe he could have continued teaching because he was angry when other students picked on his students. (Tr. 55). He did not respond well to commands or requests from other people. (Id.)

A medical expert, Dr. Andrew Steiner, testified about Plaintiff's physical impairments at the hearing. (Tr. 56-58). He testified that none of Plaintiff's physical impairments met a listed impairment. (Tr. 56-57). Dr. Steiner opined that Plaintiff would have physical restrictions for light work with occasional kneeling, crawling, stair climbing, rope climbing, crouching and using foot pedals. (Tr. 58). Additionally, Plaintiff could not climb ladders or ropes. (Id.)

A vocational expert, Edward Utities, also testified at the administrative hearing. (Tr. 59-64). The ALJ asked the vocational expert whether an individual of Plaintiff's age, educational background and work history who has the physical impairments described by the medical expert,

and who was limited to light work but could only occasionally kneel, crawl, climb stairs, and only occasionally use foot pedals could do Plaintiff's past work. (Tr. 60). The VE testified that such a person could perform the job of high school special education teacher. (Id.)

The ALJ asked a second hypothetical question adding a limitation to brief and superficial contacts with the public and co-workers. (Tr. 61). The VE testified that such a person could not perform the job of high school special education teacher. (Id.) The VE testified that such a person's transferable skills would allow for other teaching and sales positions, but the limitation to brief and superficial contact would preclude those positions. (Tr. 61-62).

The ALJ posed a third hypothetical question, adding to the first question a limitation precluding high production goals to reduce the stress level. (Tr. 62). The VE testified there were no jobs such a person could perform with little or no vocational adjustment. (Id.) The VE also testified that if a person had the limitations described by Counselor Evanson, marked impairment in the abilities to ask simple questions or request assistance, respond appropriately to changes in routine work setting, interact appropriately with the general public, maintain socially appropriate behavior, adhere to basic standards of neatness, such a person could not perform Plaintiff's past work. (Tr. 64-65).

**THE ALJ'S DECISION**

On February 18, 2009, the ALJ issued his decision denying Plaintiff's application for disability insurance benefits. (Tr. 10-19). The ALJ followed the five-step sequential evaluation set forth in the agency's regulations. See 20 C.F.R. § 404.1520(a). The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that

"significantly limits the claimant's physical or mental ability to perform basic work activities";

(3) whether the claimant's impairment "meets or medically equals a presumptively disabling

impairment listed in the regulations (if so, the claimant is disabled without regard to age,

education and work experience)"; (4) whether the claimant has the residual functional capacity

("RFC") to perform his or her relevant past work; and (5) if the ALJ finds that the claimant is

unable to perform his or her past relevant work, then the burden is on the ALJ "to prove that

there are other jobs in the national economy that the claimant can perform." <u>Fines v. Apfel</u>, 149

F.3d 893, 894-95 (8th Cir. 1998).

 At the first step of the evaluation process, the ALJ determined that the claimant has not

engaged in substantial gainful activity since May 25, 2006, the alleged onset date. (Tr. 12). At

the second step of the process, the ALJ found that Plaintiff had severe impairments of diabetes

mellitus, open angle glaucoma, bilateral inferior visual field defects, diabetic retinopathy,

tinnitus, history of arthroscopic surgery on both knees, post traumatic stress disorder, and major

depressive disorder. (Tr. 12).

 At the third step of the evaluation, the ALJ determined that Plaintiff did not have an

impairment or combination of impairments that met or medically equaled one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix One. (Tr. 13). Specifically, the ALJ

found Plaintiff's diabetes was not severe enough to meet Listing 9.08, and his visual field defects

were not severe enough to meet Listing 2.03. (<u>Id.</u>) The ALJ then considered Plaintiff's mental

impairments singly and in combination and found they did not meet or equal Listings 12.04 and

12.06. (<u>Id.</u>) The ALJ considered the "paragraph B" criteria, which requires that the mental

impairments result in at least two of the following: marked restriction of activities of daily

living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (Id.) The ALJ found Plaintiff to have mild restriction in activities of daily living because Plaintiff watches television, reads, does household and yard work, volunteers at the local VFW, golfs, shops, and coached high school basketball. (Tr. 14).

The ALJ also found Plaintiff to have mild difficulties in maintaining social functioning because, although Plaintiff's wife reported many instances of Plaintiff's unpredictable rage during their marriage, there was evidence of only one such incident since Plaintiff began treatment with a psychiatrist and psychiatric nurse practitioner in early 2006. (Id.) The ALJ further noted that although Plaintiff reported acting inappropriately as a coach of a basketball team, he continued to coach through the 2008 season. (Id.)

The ALJ found Plaintiff to have mild difficulties in concentration, persistence or pace because mental status examinations did not document any significant deficits, and Plaintiff could pursue such things as reading, watching television, golf, and fishing without reporting any difficulties. (Id.) The ALJ also found that Plaintiff did not experience any episodes of decompensation and their was no evidence of the paragraph C criteria of the listings. (Id.)

At the fourth step of the evaluation process, the ALJ determined that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b), with additional limitations of occasional kneeling, crawling, climbing stairs, ropes, ladders, scaffolds, and operating foot pedals. (Tr. 15). Based on the vocational expert's testimony, the ALJ found that Plaintiff could perform his past relevant work as a special education teacher; thus, the ALJ found that Plaintiff was not under a disability, as defined in the Social Security act, since May

25, 2006.  (Tr. 18).

**DISCUSSION**

Standard of Review

Review by this Court is limited to a determination of whether a decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).  "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  Id.

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.)  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Gavin, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability benefits.  See 20 C.F.R. § 404.1512(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated he or she can not perform prior work due to a disability, the burden of

proof shifts to the Commissioner to show that the claimant can engage in some other substantial gainful activity.  Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir. 1985).


The ALJ failed to consider all of the relevant medical records from Plaintiff's VA disability file and the VA disability ratings, which are contained in the administrative record.

Plaintiff contends the ALJ erred by failing to consider the VA's finding that Plaintiff was unemployable and failing to discuss all of the evidence from Plaintiff's VA compensation and pension file, including evaluations of examining psychologists and psychiatrists from April 2004, June 2004, November 2006, and letters containing third-party observations of Plaintiff's mental status from Mike Haburt and Jim Frey.

Defendant contends the ALJ was aware of the VA disability determination because it was mentioned at the hearing.  Defendant admits the ALJ did not mention the VA compensation and pension examinations by Dr. Fischler and Dr. Sarff, but he did discuss the VA treatment records for Plaintiff's PTSD, diabetes and glaucoma.

The following evidence is in the administrative record in this case but was not mentioned or otherwise referred to by the ALJ in his decision:  a compensation and pension psychiatric exam with Dr. J.C. Whitacre, II on April 29, 2004 (Tr. 673-675); an evaluation by Psychologist Ray Conroe for combat-related post traumatic stress disorder in June 2004 (Tr. 646-55); a psychological examination by Dr. Gary Fischler in October 2005 (Tr. 518-23); and a compensation and pension examination by Psychologist Philip Sarff in November 2006 (Tr. 345-51); letters from Mike Haburt and Jim Frey in support of Plaintiff's VA disability claim.  (Tr. 508-09, 559).   Also, Plaintiff received a number of VA disability ratings during the period of

August 2004 through February 2007, which the ALJ did not mention or otherwise address. (Tr. 280-91, 428-39, 552-58, 634-45). In the most recent VA determination, February 15, 2007, Plaintiff was granted a 100% rating from the Veteran's Administration as of August 3, 2005. (Tr. 280-91). Because the VA does not add the individual percentages of specific impairments, Plaintiff's overall combined rating was 80%, with the 100% finding based on unemployability. (Tr. 285-86.)

Social Security Ruling ("SSR") 06-3p explains how the Social Security Administration considers decisions made by other governmental agencies on the issue of disability. SSR 06-3p, 71 F.R. 45593-03, 2006 WL 2263437 (Aug. 9, 2006). First and foremost, SSR 06-3p states, "when we make a determination or decision of disability, we will consider all of the available evidence in the individual's case record. This includes but is not limited to objective medical evidence . . . information from other nonmedical sources and decisions by other governmental . . . . agencies. Id. at *44594; see also 20 C.F.R. § 404.1520(a)(3) ("we will consider all evidence in your case record. . ."). Other nonmedical sources include friends. Id.

SSR 06-3p also states, "[o]ur regulations . . . make clear that the final responsibility for deciding certain issues, such as whether you are disabled, is reserved to the Commissioner . . . . However, we are required to evaluate all of the evidence in the record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies." 2006 WL 226347, at *45596 (citing 20 C.F.R. § 404.1512(b)(5)). The Ruling explains that other agency decisions and the evidence used to make such decisions may provide insight into the claimant's impairments and "the degree of disability determined by

these agencies based on their rules." Id.  Thus, evidence of a disability decision by another

governmental agency can not be ignored.  Id.

Although the ALJ need not discuss every piece of evidence presented; here, the ALJ has

ignored much of the evidence upon which the VA disability determinations were made.

Furthermore, the ALJ made no mention of the various VA disability determinations in his

decision.  This violates SSR06-3p and the related regulations.  See also Morrison v. Apfel, 146

F.3d 625, 628 (8th Cir. 1998) (noting VA disability finding was important enough to deserve

explicit attention.)  This Court has reviewed all the evidence not addressed by the ALJ and, as

the Ruling states, finds that it is important evidence that provides insight into the claimant's

impairments. This decision can not be affirmed because the ALJ did not consider all of the

evidence of Plaintiff's mental impairments.


The ALJ failed to assign Plaintiff any functional mental limitations from his severe

mental impairments.

Plaintiff alleges the ALJ erred by not assigning him any functional limitations from his

mental impairments of depression and post traumatic stress disorder, which the ALJ found to be

severe impairments.  Plaintiff notes the definition of a severe impairment is one that has more

than a minimal effect on the ability to work.  (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s

Mem.") at 22 (citing Johnston v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000) (quoting Ngyuen v.

Chater, 75 F.3d 429, 431 (8th Cir. 1996)).

Plaintiff argues that the ALJ's decision can not be sustained because the ALJ relied on

the testimony of a vocational expert in response to a hypothetical question that did not contain

any functional limitations caused by his mental impairments. Plaintiff asserts that when the VE was asked to consider the mental limitations described by Dr. Desmonde, the consultative examiner, the VE opined that Plaintiff's past relevant work would be precluded. Plaintiff also asserts that when the VE considered the limitations described by his counselor, Robert Evanson, the VE also found Plaintiff's past relevant work to be excluded. Plaintiff concludes that reversal with an award of benefits is appropriate because a finding of disability is required under the Medical/Vocational Guidelines because Plaintiff can not perform his past work or work involving transferable skills, Plaintiff has been over 55-years-old at all relevant times, and he is limited to light work. (Pl.'s Mem. at 31 (citing 20 C.F.R. Part 404, Subpt. P, App. 2, Rule 202.06).

Defendant contends that because the ALJ found Plaintiff's mental impairments to cause only mild impairments in activities of daily living, social functioning and ability to maintain persistence and pace, the ALJ's opinion is consistent with a finding that Plaintiff's mental impairments are not severe. (Def.'s Mem. in Supp. of Mot. for Summ. J. at 14 (citing 20 C.F.R. § 404.1520a(d)(1)). Thus, Defendant contends, the ALJ committed a harmless error of finding Plaintiff's mental impairments to be severe, and there was no need for the ALJ to assign any functional mental limitations.

The regulation at 20 C.F.R. § 404.1520a describes how the SSA evaluates mental impairments. Once the ALJ has found that there is a medically determinable mental impairment, the ALJ rates the degree of functional limitation from the impairment(s). Id. at § 404.1520a(b)(1)&(2). The regulation further explains:

> (c)(3) We have identified four broad functional areas in which we
> will rate the degree of your functional limitation: Activities

of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.

    (4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; concentration, persistence or pace), we will use the following five point scale: None, mild, moderate, marked, and extreme. . .

  (d)   *Use of the technique to evaluate mental impairment(s).* After we rate the degree of functional limitation resulting from your impairment(s), we will determine the severity of your mental impairment(s).

    (1) If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities. (See § 404.1521).

A non-severe impairment is one that does not significantly limit a person's ability to do basic work activities. 20 C.F.R. § 404.1521(a). Basic work activities include use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. Id. at § 404.1521(b)(4), (5) & (6).

The record does not support a finding that Plaintiff's mental impairments are not severe, as Defendant suggests. Plaintiff's wife and one of his daughters wrote letters describing Plaintiff's longstanding difficulty controlling his anger and his inappropriate behavior that had a great impact on their lives. (Tr. 268, 459, 324-25, 586-88). Plaintiff was demoted from a job as head coach of a high school team because he could not control his anger, and he was made to take an anger management course. (Tr. 650). Although Plaintiff's problems were longstanding, he did not seek psychological services until January 2004. (Tr. 650). Dr. Ray Conroe had Plaintiff take the MMPI-II personality test, and noted that the results indicated a person who was angry, sullen, and controlling, who externalizes blame and periodically displays anger outbursts. (Tr. 654). In August 2005, Dr. John Chatel diagnosed Plaintiff with post traumatic stress

disorder and major depressive disorder, recurrent and severe, and mood congruent with psychotic features.  (Tr. 461).  Plaintiff's friend of 30 years, Mike Haburt, wrote that Plaintiff's angry outbursts were a problem in Plaintiff's personal life.  (Tr. 559).  Dr. Gary Fischler described Plaintiff as "somewhat socially withdrawn, with inappropriate anger at times."  (Tr. 521).  After first meeting with Plaintiff in November 2005, Nurse Merrill wrote a letter in December 2005, telling the Veteran's Administration she did not believe Plaintiff was capable of competitive employment.  (Tr. 445-47, 453).  Plaintiff's Counselor, Robert Evanson, and another member of Plaintiff's Veteran's Support Group, Jim Frey, wrote in support of Plaintiff's VA disability.  (Tr. 472, 508-09).  In April 2006, Plaintiff threw a battery in a store, after a clerk "gave him some attitude."  (Tr. 348).  Plaintiff reported his own inappropriate behavior, including throwing things and yelling at people in cars or on the golf course.  (Tr. 521).  Dr. Puumala noted Plaintiff got in a fight at a high school hockey game.  (Tr. 331).  In June 2006, Dr. Larry Broome found Plaintiff to continue to have anger control problems and be in a state of apprehensiveness.  (Tr. 846).  In October, Dr. Philip Sarff diagnosed Plaintiff, among other things, with anxiety disorder and paranoid and obsessive personality traits.  (Tr. 350).  In January 2007, Plaintiff's primary physician of twenty years, Dr. Ricard Puumala, also wrote in support of Plaintiff's veteran's disability for PTSD, noting Plaintiff's problems with anger management over a period of time.  (Tr. 331).  On February 15, 2007, the VA increased Plaintiff's disability rating for depression and PTSD to 70%.  (Tr. 285-86).  One of the reasons cited by the VA was Plaintiff's inability to establish and maintain effective relationships.  (Tr. 286).  When Plaintiff saw Dr. Desmonde in April 2008, he was visibly tense and anxious.  (Tr. 1030-32).  Dr.

Desmonde opined Plaintiff may have significant problems interacting with co-workers, supervisors, and the general public. (Tr. 1032).

As the ALJ noted, Nurse Merrill's treatment notes indicate that Plaintiff's overall mental health stabilized somewhat with counseling and medication. (Tr. 819, 822, 827, 1057, 1226). However, this is insufficient evidence to support the ALJ's conclusion that Plaintiff had no functional limitations from his mental impairments. See Jones v. Chater, 65 F.3d 102, 103 (8th Cir. 1995) ("PTSD is an unstable condition that may not manifest itself until well after the stressful event which caused it, and may wax and wane after manifestation.") Plaintiff's anger control issues were clearly longstanding and destructive, as evidenced by Dr. Conroe's evaluation and the letters from Plaintiff's family. (Tr. 653-54, 268, 459, 324-25, 586-88.) Dr. Desmonde's opinion that Plaintiff may have significant problems interacting with co-workers, supervisors, and the general public is overwhelmingly supported by the evidence described above. See Seamon v. Astrue, No. 08-4298, 2010 WL 323515, at *4 (7th Cir. Jan. 29, 2010) (ALJ properly restricted claimant to brief and superficial contact with others due to moderate limitations in social functioning). The vocational expert at the hearing testified that a person with Plaintiff's physical limitations who was limited to brief and superficial contact with supervisors, co-workers, and the general public could not do Plaintiff's past relevant work as a special education teacher, and could not perform any other work based on his age, education and transferable skills. (Tr. 61-62). This testimony supports a reversal and remand for award of benefits in this case. See Jackson v. Bowen, 873 F.2d 1111, 1115 (8th Cir. 1989) (holding remand was unnecessary where record supported a finding of disability).

**RECOMMENDATION**

IT IS HEREBY RECOMMENDED THAT:

      1.      Plaintiff's Motion for Summary Judgment be granted [Docket No. 6];

      2.      Defendant's Motion for Summary Judgment [Docket No. 10] be denied;

      3.      The case be remanded pursuant to sentence four of 42 U.S.C. § 405(g) for reversal and calculation for award of benefits.


Dated: June 7, 2010                    s/   Arthur J. Boylan             
                                          ARTHUR J. BOYLAN
                                        United States Magistrate Judge


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before June 21, 2010.